**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| PHILLIP KRUITWAGEN, Derivatively on Behalf of Nominal Defendant MGP INGREDIENTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BRATCHER, NEHA CLARK, DAVID COLO, BRANDON GALL, THOMAS GERKE, DONN LUX, PREET MICHELSON, LORI MINGUS, KEVIN RAUCKMAN, KAREN SEABERG, AND TODD SIWAK,<br><br>Defendants,<br><br>and<br><br>MGP INGREDIENTS, INC.,<br><br>Nominal Defendant. | Civil Action No. 2:25-cv-02262<br><br>JURY TRIAL DEMANDED |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Phillip Kruitwagen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant MGP Ingredients, Inc. ("MGPI" or the "Company"), against David Bratcher ("Bratcher), Neha Clark ("Clark"), David Colo ("Colo"), Brandon Gall ("Gall"), Thomas Gerke ("Gerke"), Donn Lux ("Lux"), Preet Michelson ("Michelson"), Lori Mingus ("Mingus"), Kevin Rauckman ("Rauckman"), Karen "Seaberg"), and Todd Siwak ("Siwak") (collectively, the "Individual Defendants" and with the Company, "Defendants") for breaches of fiduciary duties and violations of federal law.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, developed from, *inter alia*, the investigation

conducted by and through Plaintiff's attorneys, which included a review of the Company's publicly available documents, press releases published by and regarding MGPI, conference call transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of MGPI against certain officers and members of the Company's Board of Directors (the "Board") to remedy breaches of fiduciary duties and violations of federal law between May 4, 2023 and October 30, 2024, both dates inclusive (the "Relevant Period").

2. MGPI manufactures, distills, and sells alcoholic beverages such as bourbon, rye whiskey, tequila, gin, and vodka. MGPI has distilleries in Kentucky, Kansas, Indiana, and Mexico, and bottling operations in Missouri, Ohio, and Northern Ireland.

3. Retail sales show that during the COVID-19 pandemic, there was a considerable rise in alcohol consumption, particularly hard liquor, throughout the United States.

4. The rise in alcohol consumption benefitted MGPI – the Company ramped up its production and reported favorable financial results on earnings calls.

5. By late 2022, however, the demand for liquor began to taper, leading to an industry-wide destocking in spirits.

6. During the Relevant Period, the Individual Defendants made false and/or misleading statements assuring investors that: (i) MGPI was ahead of the game, having sold or "cycled through" its inventory; and (ii) MGPI's exposure to overstocking was smaller than its peers' and destocking was "not a core issue" because MGPI had properly monitored and managed inventory levels.

7. On May 4, 2023, the Individual Defendants caused MGPI to issue a press release, also filed with the SEC, announcing the Company's 2023 first quarter financial results. A corresponding earnings conference call was held, during which Defendant Colo, the Company's then-President, Chief Executive Officer ("CEO"), and director, stated: "Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned."

8. However, on February 22, 2024, during an earnings call, Defendant Bratcher, then-President, CEO, and director of the Company, disclosed that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024." Bratcher attempted to assure investors that the Company "work[ed] closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio." Bratcher further asserted that "[h]ealthy demand for our products continue[s] and we believe our business remains well-positioned."

9. Following this news, the Company's stock price fell $13.65 per share, or nearly 15%, from $91.83 per share on February 21, 2024 to $78.18 per share on February 22, 2024.

10. On October 17, 2024, MGPI changed its tone, admitting for the first time that low demand and high inventories were undermining sales.

11. On this news, MGPI's share price declined $24.07 per share, or nearly 30%, from a closing price of $81.57 per share on October 17, 2024 to a closing price of $57.50 per share on October 22, 2024.

12. Then on October 31, 2024, the Individual Defendants caused MGPI to issue a press release, also filed with the SEC, announcing its 2024 fiscal year financial results. Therein, the Company revealed that the excess inventories would have an "even greater impact" on sales in 2025 than previously stated and that due to the "softening American whiskey category trends and

elevated industry-wide barrel inventories," MGPI had to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

13. During a corresponding earnings call, Defendant Bratcher conceded that "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales." Defendant Gall, then-Chief Financial Officer ("CFO") of the Company, added that MGPI was "significantly reducing our brown goods production to better align with demand in 2025. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

14. On this news, MGPI's stock price fell $8.27 per share, or 14.7%, from a closing price of $56.31 per share on October 30, 2024 to a closing price of $49.04 per share on October 31, 2024.

15. As a direct and proximate result of the Individual Defendants' misconduct detailed herein, MGPI has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in a securities class action filed against the Company, captioned *In re MGP Ingredients, Inc. Securities Litigation*, Case No. 2:25-cv-02153 (D. Kan.) (the "Securities Class Action"), as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

16. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and the Individual Defendants longstanding business and personal relationships with one another, the Individual Defendants cannot consider a demand to commence litigation on behalf of the

Company against themselves and the other Individual Defendants with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

22. Plaintiff is, and has been at all relevant times, a shareholder of MGPI.

23. Nominal Defendant MGPI is a Kansas corporation with its principal executive offices located at 100 Commercial Street, Atchison, Kansas 66002. MGPI's common stock

trades on the NASDAQ under the ticker symbol "MGPI."

24. Defendant Bratcher served as CEO, President, and a Board member of the Company from January 2024 through December 2024. Defendant Bratcher is named as a defendant in the Securities Class Action.

25. Defendant Clark has served as a Board member of MGPI since June 2021. Clark is Chairperson of the Audit Committee. Clark is also a member of the Human Resources and Compensation Committee as well as the Nominating and Governance Committee.

26. Defendant Colo served as CEO, President, and a Board member of MGPI from May 2020 through December 2023. Defendant Colo is named as a defendant in the Securities Class Action.

27. Defendant Gall has served as interim CEO and President of MGPI since January 2025 as well as CFO and Vice President of Finance since April 2019. Defendant Gall is named as a defendant in the Securities Class Action.

28. Defendant Gerke has served as a Board member of MGPI since June 2021. Gerke serves as Chairperson of the Human Resources and Compensation Committee. Gerke is also a member of the Audit Committee as well as the Nominating and Governance Committee.

29. Defendant Lux serves as Chairman of the Board and has served as a Board member of MGPI since June 2021.

30. Defendant Michelson served as a Board member of MGPI from May 2022 to April 2025. While on the Board, Michelson served a member of the Audit Committee, the Human Resources and Compensation Committee, and the Nominating and Governance Committee.

31. Defendant Mingus has served as a Board member of MGPI since June 2020. Mingus serves as a member of the Human Resources and Compensation Committee and the

Nominating and Governance Committee.

32. Defendant Rauckman has served as a Board member of MGPI since June 2020. Rauckman serves as Chairperson of the Nominating and Governance Committee. Rauckman also serves as a member of the Audit Committee and the Human Resources and Compensation Committee.

33. Defendant Seaberg has served as a Board member of MGPI since August 2009. Seaberg serves as a member of the Human Resources and Compensation Committee and the Nominating and Governance Committee.

34. Defendant Siwak has served as a Board member of MGPI since May 2022. Siwak serves as a member of the Human Resources and Compensation Committee and the Nominating and Governance Committee.

35. The parties referenced in paragraphs 24 through 34 are herein referred to as the "Individual Defendants."

**INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

36. By reason of their positions as officers and/or directors of MGPI, and because of their ability to control the business and corporate affairs of MGPI, the Individual Defendants owed MGPI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGPI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MGPI and its shareholders.

37. Each director and officer of the Company owes to MGPI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38. The Individual Defendants, because of their positions of control and authority as directors and/or officers of MGPI, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

39. To discharge their duties, the officers and directors of MGPI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of MGPI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42. To discharge their duties, the officers and directors of MGPI were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MGPI were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGPI's own Code of Conduct;

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how MGPI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of MGPI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGPI's operations would comply with all applicable laws and MGPI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

43. Each of the Individual Defendants further owed to MGPI and the shareholders the duty of loyalty requiring that each favor MGPI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44. At all times relevant hereto, the Individual Defendants were the agents of each other and of MGPI and were at all times acting within the course and scope of such agency.

45. Because of their advisory, executive, managerial, and directorial positions with MGPI, each of the Individual Defendants had access to adverse, non-public information about the Company.

46. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MGPI.

**MGPI'S CODE OF CONDUCT**

47. MGPI's Code of Conduct provides:

> This Code of Conduct is applicable to all directors, officers, and employees of MGP Ingredients, Inc. ("MGPI") and its majority-owned subsidiaries ("we," "our," "us," or the "Company").
>
> We are committed to conducting business with the highest ethical standards, integrity, and social responsibility. We expect you to do the right thing, comply with the law, and act ethically in all matters, and this Code of Conduct is designed to set expectations regarding doing the right thing and the ethical standards that you are expected to follow. You are also expected to be familiar with this Code of Conduct. "You" means a director, officer, or employee of the Company.

48. The Code of Conduct further states:

Compliance with the Law

If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and Company policies that you should always keep in mind. . . .

Trading in MGPI's Stock and Other Securities. You must comply with insider trading and securities laws that prohibit buying or selling a company's securities while aware of material nonpublic information about a company or providing material nonpublic information to another person who trades on the basis of that information or passes that information to a third party who trades. For more information, see the Company's Insider Trading Policy.

49. The Code of Conduct continues:

Discipline/Penalties

The policies reflected in this Code of Conduct are important to the Company. Violations will subject offenders to disciplinary action, when and as warranted. Discipline will not necessarily be progressive in nature, which means that the first violation will not necessarily begin with the least severe discipline and then move up one level for each subsequent violation. The appropriate discipline will be given considering the nature of the violation and the individual's history with the Company. Possible disciplinary measures may range from a warning to termination of employment. In addition, a matter may be referred to appropriate government authorities. Violations of law may also give rise to fines or criminal prosecution.

50. Moreover, the Code of Conduct provides:

Administration

The Audit Committee is responsible for setting the standards set forth in this Code of Conduct and may update it from time to time. Any waiver of this Code of Conduct for members of the Board of Directors or executive officers may be made only by the Audit Committee and will be disclosed to the public as required by law or the rules of the Nasdaq Stock Market, when applicable. Waivers of this Code for other employees may be made only by our Chief Executive Officer or Chief Financial Officer and may be reported to the Audit Committee.

## MGPI'S AUDIT COMMITTEE CHARTER

51. MGP Ingredients' Audit Committee is governed by its Audit Committee Charter.

52. As set forth in the Audit Committee Charter:

> The purposes of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of MGP Ingredients, Inc. (the "Company") are to assist the Board in fulfilling its oversight responsibilities with respect to (i) accounting and financial reporting processes, (ii) financial statement audits, and (iii) monitoring significant risk exposures.

53. The Audit Committee Charter further provides, in a section titled "Responsibilities and Duties":

> The following are the duties and responsibilities of the Committee: . . .
>
> (f) Oversight of Financial Reporting, Financial Statements, and Published Statements. The Committee will:
>
> (i) Review and discuss with management and the Independent Auditor the Company's financial statements and disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual and quarterly reports filed with the SEC on Form 10-K and Form 10-Q and the results of the Independent Auditor's review of the quarterly financial statements included in the Company's Quarterly Report on Form 10-Q.
>
> (ii) Provide a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the applicable fiscal year based on the review and discussions with management and the Independent Auditor relating to the annual financial statements and the audit.
>
> (iii) Review and discuss with management earnings press releases, non-GAAP financial measures, earnings guidance, as well as financial information provided to analysts and rating agencies. Such discussions may be done generally (e.g. as to the types of presentations made or the types of information disclosed).
>
> (iv) Review and approve the audit committee report required by SEC rules in the Company's annual proxy statement.
>
> (v) Review and discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives on the Company's financial statements.
>
> (vi) Discuss with the Independent Auditor any matters required to be discussed by applicable requirements of the PCAOB and the SEC, including the Independent Auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting.

(vii) Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; any significant changes made by management in the basic accounting principles and reporting standards used in the preparation of the Company's financial statements; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") related to material items that have been discussed with management, including the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor.

(viii) Discuss with the Independent Auditor any recommendations of the Independent Auditor with respect to internal controls and other financial matters, including any perceived weaknesses in the Company's internal controls, policies, and procedures, any special steps taken to address material control deficiencies, and any recommendations regarding disclosures about changes in internal control over financial reporting.

(ix) Discuss with the Independent Auditor management's report on internal control over financial reporting and the Independent Auditor's attestation of the report.

(x) Discuss with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which could adversely affect the Company's ability to record, process, or summarize, and report financial data and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

(xi) Review and discuss with management and the Independent Auditor material written communications between management and the Independent Auditor, such as (a) any engagement letter or independence letter, (b) any management letter, any schedule of unadjusted differences and a listing of adjustments and reclassifications not recorded, if any, and management's responses thereto, and (c) any reports on observations and recommendations on internal controls.

(xii) Review with management and the Independent Auditor any published reports or any correspondence from governmental agencies which raise material issues regarding the Company's accounting policies or financial statements.

(g) Independent Auditor Fees. The Committee will ask the Independent Auditor to submit annually a written statement of the fees billed in each of the last two fiscal years for each of the following categories of services rendered by the Independent Auditor: audit services, audit related services, tax compliance, tax advice and tax planning services, and other services. . . .

(i) Risk Assessment. Periodically, the Committee will:
(i) Discuss the Company's major enterprise risk exposures, including cybersecurity risks, and any steps Company management has taken to monitor, manage, and mitigate such exposures.

> (j) Review legal and regulatory matters that may have a significant impact on the financial statements, related Company compliance policies and programs and material reports or inquiries received from regulatory agencies.
>
> (k)Code of Conduct. The Committee will review and approve the Company's Code of Conduct satisfying the requirements of the Exchange Act and oversee and monitor compliance under this Code of Conduct.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

54. Before the markets opened on May 4, 2023, the Individual Defendants caused MGPI to issue a press release, also attached to a Form 8-K filed with the SEC, announcing the Company's 2023 first quarter financial results.

55. In the press release, Defendant Colo commented that:

> Sales of brown goods grew 10% from the prior year period to record levels, driven by strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases. Within our Branded Spirits segment, revenue grew 2% and we recently realigned our national distribution capabilities with Republic National Distributing Company ("RNDC") toward the end of the quarter. We believe this realignment with RNDC, as well as continued investment in our premium plus family of spirits brands, continues to position us well for incremental growth and margin expansion opportunities going forward.

56. A corresponding earnings call was held that same day, during which Defendant Colo highlighted the impressive growth the Company was experiencing:

> Sales of our premium beverage alcohol increased 2%, with continued strength in brown goods sales this quarter, supported by ongoing solid demand for our new distillate and aged whiskey. We remain confident that our significant share, scale advantage and our aging whiskey inventory position, will continue to support the demand within the American whiskey category.
>
> We're pleased with the improvement in demand visibility and consistency, that we achieved in brown goods as brown good sales growth continues to outpace longer-term market trends, and is primarily driven by craft as well as multinational customers. In an effort to moderate the impact of increased input costs, and excess supply available in the market, for industrial alcohol and white goods, as discussed on our previous call, we reduced the volumes produced and sold of our industrial alcohol and white goods products during the first quarter, to minimize the negative impact on our profitability.

57. During the conference call, Defendant Colo reiterated his optimism regarding demand for the Company's products:

> We are pleased with the solid results delivered this quarter, despite increased costs and broader macroeconomic uncertainty. ***Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned.*** We expect to maintain a high level of operational execution and remain deliberate in our actions, as we navigate the market dynamics this year, which is why we are reconfirming our full year fiscal 2023 guidance.

58. During the question-and-answer portion of the earnings call, Defendant Colo was asked by analysts to elaborate on inventory levels. While recognizing that inventory levels remained high, Colo provided assurances that, by the end of the year, these levels would normalize:

> [Analyst]: And then my follow-up question is on the commentary around inventories. Thank you very much for the incremental color on what it would have looked like or your top line would have looked like ex-Yellowstone. Can you comment at all on kind of more broadly like, what you're hearing from your wholesalers comfort around inventory levels, as we've gone through earnings season, it does seem -- and it's consistent with your script, there's a lot of caution around the US consumer. So I'm just kind of wondering, what wholesaler comfort level is with inventories today, what your comfort level is with your inventories today? Thank you.
>
> [Colo]: Yes. I think in general, I'd say that the distributors may be hearing a little more inventory at this point than normal. However, kind of the other thing that I think, we're anticipating at the distributor level is with interest rates continuing to rise and at the level they are now. It wouldn't surprise us if some of the distributors maybe carried less inventory going forward, because their carrying costs are going to be significantly higher than they were even a year ago. But that's kind of a different issue than the demand side of the equation really to inventory, Vivien. But those are a couple of our observations in the market right now
>
> [Analyst]: That's a really interesting consideration to call out. Is that factored into your full year guidance?
>
> [Colo]: It is at this point, yes. . . .
>
> ***
>
> [Analyst]: Question on inventory, would you expect inventory levels to stay somewhat elevated in relation to sales as the year progresses, or will that be worked down to kind of be more in line with the sales growth at the end of the year?
>
> [Colo]: That's our expectation. Sean, we think that the year presses again

> particularly in line if you look at the carrying cost in the current interest rate environment we expect that inventory levels will pretty much -- ***shipments should equal to completions is the ideal way the industry runs and we anticipate that as the year plays out that's where the inventories will kind of normalize too.***

59. The Individual Defendants' statements in or referred to in ¶¶ 54-58 were materially false and/or misleading and/or failed to disclose material adverse facts about MGPI's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and failed to disclose that: (i) demand for MGPI's products did not, in fact, remain strong; (ii) the Company failed to adjust its production and inventory levels accordingly; and (iii) as a result, MGPI's inventory levels were unsustainably high.

60. On November 2, 2023, the Individual Defendants caused MGPI to issue a press release, also attached to a Form 8-K filed with the SEC, announcing the Company's 2023 third quarter financial results.

61. In the press release, Defendant Colo boasted MGPI's brown goods sales, commenting that sales were "driven by strong demand for our new distillate and aged whiskey."

62. A corresponding earnings conference call was held, during which Defendant Colo stated that sales of brown goods for 2024 were "already committed":

> Brown goods sales growth has continued to outpace longer term market trends and has been primarily driven by craft, as well as multinational customers. Our confidence in our brown goods sales visibility for the balance of the year remains high.
>
> Looking ahead to fiscal 2024, our visibility is also improving as we believe we now have the vast majority of our expected Distilling Solutions segment brown goods sales for 2024 already committed.
>
> We believe we are well positioned to support continued growth in the American whiskey category. We will continue to be strategic with our aged whiskey sales to enable us to meet expected customer needs for the balance of this year, as well as position us to meet anticipated customer needs in the coming years.

63. With regard to inventory, Defendant Colo assured investors that the Company "remain[s] confident that inventory destocking for our brands is close to running its course, and

we are focused on driving velocity and points of distribution across our portfolio of brands." He further stated that "[d]emand for our products in each of the three segments remain strong and we believe our actions will continue to position the business for long-term success."

64. In response to concern from analysts during the conference call about inventory levels, Defendant Colo stated that the Company had put most of these issues behind them and that the remaining issues were immaterial:

> [Analyst]: A couple of questions. I guess, first on the Branded Spirits business, you talked that you were still working through some of kind of the excess inventory within channels and I think the whole industry is. I mean, any way to quantify like what sales could have been or how much that impacted branded sales, because still 6% year-over-year is pretty solid. So just trying to understand or did it really was a very small impact and no impact is expected going forward?
>
> [Colo]: Yeah. I think, Bill, we discussed this a little bit on the last quarter call, but we feel like we are pretty much through any issues with excess inventory at the distributor level. There may be a few brands that we still have a little bit to work through, but there was really, I don't think our revenue was materially impacted due to any excess inventory issues in the channel. . . .

65. In response to a question about the volume dynamics between brown and white goods, Defendant Gall reinforced Defendant Colo's statements by saying that demand for the Company's brown goods remained intact:

> [Analyst]: Hi. Thank you. Good morning and I'd like to echo my congratulations to Dave. My first question is on the Distillery Products segment, another very nice quarter of price mix realization in premium beverage alcohol, of course, volumes are under pressure. I was wondering whether you could offer some commentary on kind of the volume dynamics between brown goods and white goods in the quarter, please? Thanks.
>
> [Gall]: Yeah. Vivien, this is Brandon. So, yeah, in our Q, we do break out premium beverage alcohol, which includes both brown goods and white goods, and within that, we share that sales are up 13%, but volume to your point is off 15% and that 15% downdraft is all directly related to white goods and industrial alcohol. So our demand for our brown goods from a volume standpoint remains intact, but I will share the majority of the 28% growth in brown goods in the quarter was price driven. . . .

66. Defendant Colo concluded:

> [F]rom our perspective, on our inventories, et cetera, what we try to do is balance particularly on our aged side. Our inventory needs and build of inventory with our anticipated future customer needs and demand. And we are still in that position today, we make our laydown decisions based on those anticipated needs and we are not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard.

67. Lastly, Defendant Colo also announced his retirement, and announced that Defendant Bratcher would become MGPI's next President and CEO.

68. The Individual Defendants' statements in or referred to in ¶¶ 60-67 were materially false and/or misleading and/or failed to disclose material adverse facts about MGPI's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and failed to disclose that: (i) the extent of the decreasing demand in the alcohol industry was more severe than the Individual Defendants revealed; and (ii) MGPI failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased.

**The Truth Begins to Emerge**

69. On February 22, 2024, the Individual Defendants caused MGPI to issue a press release, also attached to a Form 8-K filed with the SEC, wherein the Company announced its 2023 fourth quarter and full year financial results.

70. In the press release, Defendant Bratcher commented:

> Demand for our new distillate and aged whiskey was strong, which resulted in brown goods sales increasing 39% and 26% for the fourth quarter and full year 2023, respectively, as compared to the prior year periods We are very pleased with our performance for the quarter and full year and remain confident in the long-term sustainability of our business model.

71. Despite Defendant Bratcher's positive remarks, the press release also disclosed that the Company's revenue guidance for fiscal year 2024 was at a range of $742 to $756 million, about 4.9% below analysts' estimates of $787.8 million.

72. A corresponding earnings call was held, during which Defendant Bratcher

confirmed that recent industry reports indicated "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024."

73. In an attempt in ease investor fears, Defendant Bratcher added that the Company had "worked closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio. . . . Healthy demand for our products continue and we believe our business remains well-positioned."

74. Importantly, Defendant Bratcher further stated that "more than 90% of our new distillate whiskey sales volume is committed in 2024, compared to 50% of our aged whiskey sales volume committed." However, he also noted that:

> We expect total aged whiskey revenues in 2024 to be less than 2023, due to our strategy of developing longer-term stability with new distillate and because of our success in working with longer-term craft customers, who started their brands with aged whiskey and are now moving into the new distillate market.

75. During the conference call, in response to questions from analysts about product sales and whiskey supply levels in relation to industry headwinds, Defendants Gall and Bratcher downplayed investor concerns by saying that the Company had prepared for a change in trends in 2023:

> [Analyst]: Just wanted to go back on the kind of the new distillate sales, and I think one of the things you said was total sales would be down in '24 versus '23. So if you maybe could give some more color, I think you kind of explained what was some customer changes and stuff like that, but try to understand that?
>
> And then also, you had mentioned that you're monitoring the overall American whiskey supply levels, and that might be a headwind. So kind of maybe help us understand that? Are you talking about at retail or are you talking about supply of other players coming for new distillate?
>
> [Gall]: Yeah, Bill. I'll start on that. Yeah, thanks for giving us the opportunity to clarify. So we do not expect new distillate sales to decline year- over-year. In fact, we expect brown goods sales in total to continue to grow in line with or better than the broader category of American whiskey in 2024. What we're trying to get across in our prepared remarks is that the proportion of new distillate sales versus aged sales has been growing. And that has been deliberate as David mentioned on the call. And the reason for that is as our customers that traditionally bought aged, as

they continue to mature and grow, they're now better able to finance new distillate.

And so we're leaning into that because there's a lot of attributes of new distillate customers that we find attractive, such as the greater visibility they provide and the greater cash flow characteristics of sliding (ph) distillate versus aged brings. As far as moderating the overall supply to the industry, that's not our plan. We're continuing to grow with our portfolio and with our customers. And as such, the mix may change more towards new versus aged, but we continue to grow at the same pace or better than the American whiskey category as we've done in recent years. . . .

[Bratcher]: Yeah. I'll add to that too, just in clarification. The new distillate focus is really critical for our business. It gives us longer-term arrangements, financial stability, and visibility for multi-years on average. It's a better business for us in terms of understanding the impact financially on the overall business. It also is somewhat a normal cycle, as the category continues to grow and some of our previous craft customers become bigger, they're naturally going to switch over to new distillate supply, that's just normal. There is no -- we have no plans to moderate our supply to it.

As a matter of fact, we've taken just the opposite approach, as you heard in our call (ph) script, that we're expanding one of our major distilleries in Kentucky, basically doubling its capacity and we expect it to come online mid-year. So we're very optimistic about Branded sales and a plan to expand and continue to grow with the segment. . . .

[Analyst]: Got it. Now that helps. And then if I'm looking at the, just the aged demand, I understand that you're naturally kind of leaning into the new, but are you hearing from your customers, now you have 800 customers, any worries that there's going to be a slowdown in brown good demand three, four years out from now, or is kind of the overall interest pretty much the same as it has been the past few years?

[Bratcher]: I think what we could say on that is that if we look at our aged distillate and when you referenced about 50% of it being obligated, that's actually pretty high number on aged because most of these tend to be craft customers or new entrants into the category. So actually we feel pretty good about the amount that we have contracted and how that relates to any potential unknown is, is that, those the craft -- the craft distilleries or craft brand companies are subject to the same inventory, retail, wholesale level type of inventory situations as anybody.

And so with higher interest rates and everything else, they're being a little more cautious with their investment. In the past, we've saw them buy just so they could corner their piece of the business. Now you're starting to see them switch to more just-in-time type of demand. They want to transact, know they can fill the product and get it right through the shelf, given the high interest rates that they operate in. . . .

[Analyst]: Got it. And last question, just on the aged, sorry, on the Branded

> portfolio, your comments about there's still some destocking at distributors and stuff like that, does that mean, I thought most of the impact you kind of saw in the first half of last year, do you expect a quarter where we could be flat to down for that overall business, excluding Penelope or is most of the heavy destocking done?
>
> [Bratcher]: The comment in general was about the industry overall. There is still a push on inventory destocking for the industry overall. As it relates specifically to our business, we've worked really hard in the past year to manage that -- actively manage that with our wholesalers. We believe we have it in a controllable area of data on hand. At the end of the day, the wholesalers do control the inventory and they place the order and they decide what the number is. I think our exposure on it for us is smaller than, let's say, our peer set because I think we've done a really good job of managing it in 2023.

76. On this news, the Company's stock price fell by $13.65 per share, or 14.86 percent, from $91.83 per share on February 21, 2024 to $78.18 per share on February 22, 2024.

77. The Individual Defendants' statements in or referred to in ¶¶ 69-75 were materially false and/or misleading and/or failed to disclose material adverse facts about MGPI's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and failed to disclose that: (i) demand for the Company's products had already been declining in addition to an oversupply of alcoholic beverages that was unsustainable and uncontrollable; and (ii) the expected decline in whiskey revenues for 2024 was precisely due to these factors.

78. On April 9, 2024, the Individual Defendants caused MGPI to file a proxy statement with the SEC (the "2024 Proxy Statement"). Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act.

79. The 2024 Proxy Statement solicited the Company's stockholders to, *inter alia,* (1) elect nine directors for a one-year term, including Defendants Bratcher, Clark, Gerka, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak; (2) ratify the appointment of KPMG LLP as our independent registered public accounting firm for 2024; (3) approve, on an advisory

basis, the compensation of our named executive officers; and (4) approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan, which makes clear that employees and non-employee directors alike are eligible to receive compensation under the plan and that there is no separate non-employee director incentive plan.

80. The 2024 Proxy Statement provided, with respect to the election of directors, that:

> Our Board of Directors, upon recommendation of its Nominating and Governance Committee, has nominated David S. Bratcher, Neha J. Clark, Thomas A. Gerke, Donn Lux, Preet H. Michelson, Lori L.S. Mingus, Kevin S. Rauckman, Karen L. Seaberg, and Todd B. Siwak for election as a director, to hold office for a one-year term and until their respective successor is elected and qualified or until their earlier death, resignation, or removal. Information regarding our director nominees can be found under "Board of Directors." . . .
>
> OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE ELECTION OF EACH OF THE NINE DIRECTOR NOMINEES

81. With respect to the MGP Ingredients, Inc. 2024 Equity Incentive Plan, the 2024 Proxy Statement provided:

> On April 8, 2024, our Board, at the recommendation of its Human Resources and Compensation Committee (defined in this Proposal 4 as the "Committee"), approved the MGP Ingredients, Inc. 2024 Equity Incentive Plan (the "2024 Plan"), subject to approval by our stockholders at the Annual Meeting. The 2024 Plan will become effective on the date it is approved by our stockholders, and will replace our existing 2014 Plan and 2014 Non-Employee Director Equity Incentive Plan (together, the "Prior Plans"), which terminated following expiration of their ten-year terms on April 1, 2024. Equity awards made to non-employee directors after the effective date of the 2024 Plan will be made under the 2024 Plan (or a subplan thereof) instead of pursuant to a separate non-employee director equity plan.
>
> The number of shares of our common stock that may be the subject of awards and issued under the 2024 Plan is 1,320,000, less one share of common stock for every one share of common stock granted under the Prior Plans after March 1, 2024 but prior to the effective date of the 2024 Plan. Awards outstanding under the Prior Plans as of the date the 2024 Plan becomes effective will continue to be subject to the terms of the applicable Prior Plan, and if any awards under the Prior Plans that were outstanding on March 1, 2024 subsequently expire, are forfeited or cancelled, or are settled in cash, the shares subject to those awards will become available for awards under the 2024 Plan. No new awards will be made under the Prior Plans after their expiration date on April 1, 2024. . . .
>
> OUR BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE

> APPROVAL OF THE MGP INGREDIENTS, INC. 2024 EQUITY INCENTIVE PLAN

82. Regarding the "Board Role in Risk Oversight," the 2024 Proxy Statement stated:

> Our Board as a whole has ultimate responsibility for risk oversight. It exercises this oversight function through its standing committees, each of which has primary risk oversight accountability for matters relating to their respective area of responsibility, as detailed below. The independent structure of our Board and Board committees allows for objective risk oversight.
>
> •Audit Committee: Oversees the integrity of our financial statement and financial reporting process, risks related to our financial reporting practices and internal controls, and our enterprise risk management ("ERM") process, which includes cybersecurity risks.
>
> As part of our ERM process, management regularly identifies, evaluates, and prioritizes potential risks and creates a risk register of these risks. Our executive management team and business unit leaders decide on actions and strategies to use to mitigate our risks based on this risk register. Our ERM process and risk register were reviewed with the Audit Committee, along with our strategies for managing our risks, at three meetings during 2023.
>
> •Human Resources and Compensation Committee: Oversees risks related to our compensation policies and practices as well as human capital management.
>
> •Nominating and Corporate Governance Committee: Oversees risks related to our corporate governance, governance structure, Board composition, Board independence, as well as environmental, social, and governance ("ESG") matters, except those matters overseen by another Board committee (such as human capital management). . . .

83. Regarding the Code of Conduct, the 2024 Proxy Statement stated:

> Our Board has adopted Corporate Governance Guidelines, which are available on the Governance page of the Investor Relations section of our website at ir.mgpingredients.com/corporate-governance/governance-documents, along with our Board committee charters and Code of Conduct.

84. The 2024 Proxy Statement was materially false and misleading because it failed to disclose that: (i) the Individual Defendants did not fully grasp the decreasing demand in the alcohol industry; (ii) MGPI failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased; (iii) by recommending that the Company's stockholders approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan,

the Individual Defendants were wrongfully interested in increasing their compensation for the future; (iv) the Individual Defendants violated MGPI's Code of Conduct; and (v) the Individual Defendants failed to fulfill their internal control and risk oversight responsibilities.

85. As a result of the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to: (1) elect nine directors for a one-year term, including Defendants Bratcher, Clark, Gerka, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak; (2) ratify the appointment of KPMG LLP as our independent registered public accounting firm for 2024; (3) approve, on an advisory basis, the compensation of our named executive officers; and (4) approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan,

86. The 2024 Proxy Statement harmed MGPI by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting the Company.

87. On May 2, 2024, the Individual Defendants caused MGPI to issue a press release announcing the Company's 2024 first quarter financial results.

88. A corresponding earnings call was held, during which Defendant Gall assured investors that the Company "continue[s] to monitor the potential impact of inventory levels at distributors overall, American whiskey supply and consumption patterns and inflation," but that MGPI was "uniquely positioned to grow as a company in this dynamic operating environment."

89. Defendant Gall further claimed that MGPI "continue[s] to monitor the potential impact of inventory levels at distributors overall, American whiskey supply and consumption patterns and inflation" and was "uniquely positioned to grow as a company in this dynamic operating environment."

90. Defendant Bratcher elaborated that inventory had "stabilized" as the Company had "worked really hard with our distributors and understanding the inventory levels and managing [how] to meet customer demand," adding that "destocking for us at a distributor level is not a core issue," and that the Company had "been able to…get that inventory manage[d] to

the right level[.]"

91. On August 1, 2024, the Individual Defendants caused MGPI to issue a press release, wherein the Company announced its 2024 second quarter financial results.

92. A corresponding earnings call was held, during which Defendant Bratcher expressed that he was "proud of our sales team for their nimbleness as they continue to work with our branded customers to help them successfully adapt to the current consumption and inventory patterns at distributor and retailer levels." Further, he stated that:

> Distributor inventories for our branded portfolio remain relatively stable, even below historical levels. . . . Distributor inventory levels for our brands are in good shape [I]nventory is exactly where we need . . . [and MGP Ingredients] continue[d] to monitor [inventories] on a daily basis.

93. The Individual Defendants' statements in or referred to in ¶¶ 87-92 were materially false and/or misleading and/or failed to disclose material adverse facts about MGPI's business and operations. Specifically, the Individual Defendants failed to disclose that: (i) the extent of the decreasing demand in the alcohol industry was more severe than the Individual Defendants revealed; and (ii) MGPI failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased.

***The Truth Fully Emerges***

94. On October 17, 2024, the Individual Defendants caused MGPI to issue a press release, also attached to its Form 8-K filed with the SEC, announcing the Company's preliminary results for its 2024 third quarter.

95. The press release revealed that MGPI expected its sales to decrease fourteen percent from the prior year's third quarter, and, accordingly, the Company would be downwardly adjusting its guidance.

96. Confirming for the first time that high inventory levels were a significant problem, Defendant Bratcher stated:

> Soft alcohol spirits category trends and elevated industry- wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base. We expect these industry headwinds to persist at least through the rest of the year and will share details about our 2025 outlook with our fourth quarter 2024 earnings release.

97. The market reacted negatively as a result of this news. For example, on October 18, 2024, Lake Street wrote that the "magnitude of this decline was a material surprise given how much visibility we thought existed via the contracted status of this business." TD Cowen stated that the news was "worse than we expected." Truist wrote that the sudden downturn was "surprising" even though the market was already "well aware of the supply issues in the industry." Wells Fargo issued a report stating that:

> Negative pre-announcement. Post close 10/17, MGPI announced softer Q3 results and cut the FY24 guide (sales -6.5%, EBITDA -10% at mid-point), citing category deceleration and elevated inventories pressuring demand. Even with strong H1 delivery, these overhangs have been a headwind to MGPI shares, and now materializing on a lagged basis vs branded peers. We think the lowered outlook raises credibility concerns, with reduced visibility into Q4/FY25 likely putting MGPI in the penalty box near term.

98. Consequently, MGPI's stock price fell by $24.07 per share, or 29.5 percent, from $81.57 per share on October 17, 2024 to $57.50 per share on October 22, 2024, the next trading day, on usually heavy trading volume.

99. On October 31, 2024, the Individual Defendants caused MGPI to issue a press release, also attached to its Form 8-K filed with the SEC, announcing the Company's 2024 third quarter financial results.

100. In the press release, Defendant Bratcher stated that because of "the softening American whiskey category trends and elevated industry-wide barrel inventories," MGPI had to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

101. A corresponding earnings call was held, during which Defendant Bratcher finally

admitted that "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales."

102. Defendant Gall added that MGPI would be "significantly reducing our brown goods production to better align with demand in 2025. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

103. During the question-and-answer portion of the conference call, Defendant Bratcher had the following exchange with analysts:

> [Analyst]: we've seen a slowdown in American whiskey consumption now for 12, almost 18 months. And so I guess the surprise factor is that you're just realizing it, seeing it now. . . .
>
> [Analyst]: Okay. Then getting back to the -- it does surprise me that industry-wide everybody sort of missed the slowdown. I'm curious whether any of that has to do with any on-premise, off-premise trends that may have been missed?
>
> And then the second question is, what also may have been missed, which I've been seeing for a while is, consumer liquor cabinet destocking. Once you can -- once you're able to get your favorite brand back during the COVID error, it was hard to find it. And if you found a bottle or 2, you bought 2 or 3 or 4 bottles because you weren't sure you were ever going to see them again.
>
> And I guess at some point, consumers decided -- they felt more comfortable with starting to see their favorite brands on the shelves and starting to -- instead of buying it, just going through their own cabinet and reducing their own inventory, I guess there's no way -- Have you done any research on that part of the equation as far as the slowdown in consumption is concerned? And just also the comments on the premise versus -- on-premise versus off-premise missing the slowdown here?
>
> [Bratcher]: Okay. And I'll take that one. So in general, if you think about on-premise versus off-premise, the mix is roughly the same, but the problem post-COVID, there's not as many as on-premises there was. So you're still seeing that being relaunched over time. I'm not going to attribute that mix to the industry's view on why it happened. I tend to take more of a macro view on this. I tend to think that we're in the middle of an election. We've had all kinds of interesting things going on in the environment. Consumer spending is a little bit slower than this.
>
> I think there's a lot of external pressures going on here that is making that consumer make different choices, all right? And so I don't want to speculate on they're selling

> more there or not selling more there. I'm attributing it to that consumer. I also bring it back to this COVID piece. Having done this for 30 years in the brands, what we're selling back to is about what we should be in the industry. COVID was great for our industry for the period of time.
>
> And now when we all reflect back and we look at these last few years of correction, and it is inventory destocking at a wholesaler, it is inventory destocking in a pantry. You've got multitudes of variables coming to a head. Those 2 shall pass. Now what we all are terrible at doing, myself and everybody else in the industry is telling you exactly when that's going to pass. You know why? Because we can't read the consumers' minds. We can only watch what they're doing and react to their needs.

104. On this news, the Company's stock price fell by $8.27 per share, or 14.7 percent, from $56.31 per share on October 30, 2024 to $49.04 per share on October 31, 2024.

105. On December 20, 2024, MGPI announced that Defendant Bratcher was departing the Company "under circumstances entitling him to severance benefits under his employment agreement" and that Defendant Gall would become Interim CEO.

## SHARE REPURCAHSES DURING THE RELEVANT PERIOD

106. During the Relevant Period, the Individual Defendants harmed the Company by causing MGPI to reinitiate repurchases of its common stock. In total, the Company spent approximately $10 million to repurchase approximately 128,360 shares of its own common stock at artificially inflated prices from March 2024 through July 2024. This was an overpayment of about $3.7 million.

107. According to the Company's SEC filings between March 1 and March 31, 2024, MGPI repurchased 59,084 shares of its common stock at an average price per share of approximately $84.62, for a total cost of nearly $5 million. As the Company's stock was worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $2,102,209.

108. According to the Company's SEC filings, between May 1 and May 31, 2024, MGPI repurchased 33,363 shares at an average price per share of approximately $74.93, for a

total cost of nearly $2.5 million. As the Company's stock was worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $2,499,890.

109. According to the Company's SEC filings, between July 1 and July 31, 2024, MGPI repurchased 35,913 shares at an average price of approximately $69.61, for a total cost of nearly $2.5 million. As the Company's stock was worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $738,730.

110. Accordingly, during the Relevant Period, the Individual Defendants caused MGPI to spend a total of about $10 million to repurchase about 128,360 shares of the Company's common stock at artificially inflated prices. This was an overpayment of about $3.7 million.

**INSIDER SALES DURING THE RELEVANT PERIOD**

111. During the Relevant Period, as a result of the Individual Defendants' above false and misleading statements, the Company's share price was artificially inflated. During this time, while in possession of material, non-public information, Individual Defendants Lux, Mingus, and Seaberg engaged in improper insider sales, netting total proceeds of approximately $14.2 million.

112. Defendant Lux's insider sales, made with material nonpublic information before the truth was exposed, and which demonstrate his motive in facilitating and participating in the scheme, are set forth below:

| DATE OF TRANSACTION | SHARES SOLD | AVERAGE SHARE PRICE | SALE PROCEEDS |
|---|---|---|---|
| May 10, 2023 | 10,000 | $83.00 | $829,970 |
| May 13, 2023 | 22,000 | $82.84 | $1,822,567 |
| June 9, 2023 | 2,005 | $101.69 | $203,888 |
| June 12, 2023 | 8,000 | $101.56 | $812,480 |
| May 14, 2024 | 20,000 | $82.30 | $1,645,980 |

| | | | |
|---|---|---|---|
| May 15, 2024 | 15,000 | $81.90 | $1,228,470 |
| **TOTAL** | 77,005 | | $6,543,355 |

113. Defendant Mingus's insider sales, made with material nonpublic information before the truth was exposed, and which demonstrate her motive in facilitating and participating in the scheme, are set forth below:

| DATE OF TRANSACTION | SHARES SOLD | AVERAGE SHARE PRICE | SALE PROCEEDS |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624.00 |
| May 26, 2023 | 400 | $97.34 | $38,937.00 |
| May 30, 2023 | 3,692 | $94.92 | $350,437.00 |
| June 9, 2023 | 1,096 | $101.06 | $110,761.00 |
| July 3, 2023 | 2,268 | $106.61 | $241,780.00 |
| August 1, 2023 | 320 | $112.62 | $36,038.00 |
| August 2, 2023 | 324 | $113.19 | $36,673.00 |
| August 8, 2023 | 1,215 | $122.17 | $148,436.00 |
| September 1, 2023 | 591 | $120.32 | $71,109.00 |
| October 2, 2023 | 383 | $104.69 | $40,096.00 |
| November 1, 2023 | 108 | $93.92 | $10,143.00 |
| December 4, 2023 | 1,061 | $90.63 | $96,158.00 |
| January 2, 2024 | 354 | $99.21 | $35,120.00 |
| February 15, 2024 | 113 | $90.00 | $10,170.00 |
| May 22, 2024 | 2,430 | $78.88 | $191,678.00 |
| August 23, 2024 | 2,764 | $90.46 | $250,031.00 |
| September 4, 2024 | 100 | $90.02 | $9,002.00 |
| **TOTAL** | 17,827 | | $1,737,193.00 |

114. Defendant Seaberg's insider sales, made with material nonpublic information before the truth was exposed, and which demonstrate her motive in facilitating and participating

in the scheme, are set forth below:

| DATE OF TRANSACTION | SHARES SOLD | AVERAGE SHARE PRICE | SALE PROCEEDS |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624 |
| May 26, 2023 | 400 | $97.34 | $38,937 |
| May 30, 2023 | 3,692 | $94.92 | $350,437 |
| June 20, 2023 | 985 | $101.70 | $100,174 |
| July 3, 2023 | 4,264 | $106.59 | $454,499 |
| July 5, 2023 | 7,334 | $106.58 | $781,657 |
| August 2, 2023 | 880 | $113.57 | $99,941 |
| September 5, 2023 | 853 | $117.22 | $99,988 |
| October 2, 2023 | 1,414 | $103.46 | $146,296 |
| October 3, 2023 | 9,204 | $102.24 | $941,016 |
| November 1, 2023 | 1,073 | $93.20 | $100,003 |
| December 4, 2023 | 1,110 | $90.09 | $99,999 |
| January 2, 2024 | 2,544 | $99.09 | $252,079 |
| January 3, 2024 | 9,345 | $96.30 | $899,923 |
| February 16, 2024 | 3,329 | $90.11 | $299,976 |
| August 23, 2024 | 12,092 | $90.64 | $1,095,970 |
| September 4, 2024 | 1,109 | $90.14 | $99,965 |
| **TOTAL** | 60,236 | | $5,921,484 |

## DAMAGE TO MGPI

115. As a direct and proximate result of the Individual Defendants' misconduct, MGPI has expended, and will continue to expend, significant sums of money.

116. Such expenditures include, but are not limited to, legal fees associated with defending against the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, as well as payments of

any fine or settlement amounts associated with the Company's violations.

117. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal controls with respect to public disclosures and legal and regulatory compliance.

118. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

119. As a direct and proximate result of the Individual Defendants' actions, MGPI has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120. Plaintiff brings this action derivatively in the right and for the benefit of MGPI to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and other violations of law by the Individual Defendants.

121. MGPI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

122. Plaintiff is and has been a shareholder of MGPI at all relevant times. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

123. Given the facts as alleged herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile.

124. At the time this action was commenced, the Board consisted of Defendants Clark, Gerke, Lux, Mingus, Rauckman, Seaberg, and Siwak and Non-Parties Gerardo Lopez ("Lopez")

and Martin Roper ("Roper") (the "Director-Defendants"). Plaintiff is only required to show that a majority of the Director-Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

125. A pre-suit demand on the Board would be futile as a majority of the members of the Board are incapable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

126. Demand is excused as to all of the Director Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. The Director-Defendants took no steps in a good faith effort to prevent or remedy the situation.

127. The Director-Defendants all face a substantial likelihood of liability for their individual misconduct as, in their capacity as directors of the Company, they each had a fiduciary duty to ensure that MGPI's SEC filings, press releases, and other public statements concerning the Company were accurate.

128. Each of the Director-Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

129. Each of the Director-Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

130. Additionally, each of the Director-Defendants received payments, benefits, stock options, and other financial awards by virtue of their membership on the Board and their control of the Company.

131. Demand is excused as to Defendant Clark. Defendant Clark has served as a Board member of MGPI since June 2021. Defendant Clark disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which she is eligible to receive stock awards. Further, Defendant Clark is a member of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Defendant Clark knowingly or recklessly allowed the issuance of the improper statements. Defendant Clark is also a member the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendant Clark failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. For these reasons, Defendant Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132. Demand is excused as to Defendant Gerke. Defendant Gerke has served as a Board member of MGPI since June 2021. Defendant Gerke disseminated and/or permitted the

dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which he is eligible to receive stock awards. Further, Defendant Gerke is a member of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Defendant Gerke knowingly or recklessly allowed the issuance of the improper statements. Defendant Gerke is also a member the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendant Gerke failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. For these reasons, Defendant Gerke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133. Demand is excused as to Defendant Lux. Defendant Lux serves as Chairman of the Board and has been a Board member since June 2021. Defendant Lux disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which he is eligible to receive stock awards. Further, Defendant Lux engaged in improper insider sales while in possession of material non-public information about the Company. Additionally, according to the 2024 Proxy, Defendant Lux owns 7,963,169 shares of the Company's common

stock, or approximately 36.2 percent of the Company's shares. Defendant Lux served as President and CEO of Luxco, which the Company merged with in April 2021, from 1991 until March 2021, and as Chairman of Luxco from 2010 until March 2021. The 2024 Proxy Statement concedes that Lux is not independent. Further, Defendant Bratcher served in several leadership roles at Luxco since his hire in 1998 as Director of Operations, including as President of Luxco from 2013 until the April 2021 merger with Luxco. For these reasons, Defendant Lux breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134. Demand is excused as to Defendant Mingus. Defendant Mingus has served as a member of the Board since June 2020. Defendant Mingus disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which she is eligible to receive stock awards. Further, Defendant Mingus is a member the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendant Mingus failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. Lastly, Defendant Mingus engaged in improper insider sales while in possession of material non-public information about the Company. For these reasons, Defendant Mingus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

135. Demand is excused as to Defendant Rauckman. Defendant Rauckman has served

as a member of the Board since June 2020. Defendant Rauckman disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which he is eligible to receive stock awards. Further, Defendant Rauckman is a member of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Defendant Rauckman knowingly or recklessly allowed the issuance of the improper statements. Defendant Rauckman is also a member the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendant Rauckman failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. For these reasons, Defendant Clark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Demand is excused as to Defendant Seaberg. Defendant Seaberg has been a member of the Board since August 2009. Defendant Seaberg disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which she is eligible to receive stock awards. Further, Defendant Seaberg is also a member the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance

policies and procedures of the Company. Defendant Seabreg failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. Lastly, Defendant Seaberg engaged in improper insider sales while in possession of material non-public information about the Company. For these reasons, Defendant Seaberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137. Demand is excused as to Defendant Siwak. Defendant Siwak has been a member of the Board since May 2022. Defendant Siwak disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC and caused the Company's stockholders to vote to approve the proposals contained therein, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan, under which he is eligible to receive stock awards. Further, Defendant Siwak is a member of the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendant Siwak failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. For these reasons, Defendant Siwak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Demand is further excused as to Defendants Gerke, Rauckman, and Siwak (the "Class A Directors") because the Class A Directors are beholden to and controlled by Defendant Lux, who is the common stock controlling shareholder and controls the Class A Directors' continued nomination to the Board. The Class A Directors are thus dependent upon Defendant

Lux for their continued positions and the accompanying compensation. For these reasons, the Class A Directors are not independent or disinterested, and thus demand upon them is futile, and therefore, excused.

139. Demand is further excused as to Defendants Clark and Mingus (the "Class B Directors") because the Class B Directors are beholder to and controlled by Defendant Seaberg, who is the preferred stock controlling shareholder and controls the Class B Directors' continued nomination to the Board. The Class B Directors are thus dependent upon Defendant Seaberg for their continued positions and the accompanying compensation. For these reasons, the Class B Directors are not independent or disinterested, and thus demand upon them is futile, and therefore, excused.

140. MGPI has and will continue to be exposed to significant losses due to the wrongdoing described herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others responsible to attempt to recover for MGPI the damages and harm the Company has suffered and will continue to suffer.

141. The Individual Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

142. The Director-Defendants may also be protected against personal liability for their breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with Company funds. If there is such a policy, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants. As a result, if the Director-Defendants were to sue themselves or certain of the officers of MGPI, there would be no directors' and officers' insurance

protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as here, such insurance coverage, to the extent it exists, will provide a basis for recovery for MGPI.

143. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MGPI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.

144. Accordingly, a pre-suit demand on the Board is futile and, therefore, excused as a majority, if not all, of the Director-Defendants, cannot consider a demand independently and disinterestedly.

**COUNT I**

***Against the Individual Defendants for Breach of Fiduciary Duty***

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. The Individual Defendants owed the Company fiduciary obligations of candor, good faith, fair dealing, loyalty, and due care.

147. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, candor, oversight, and supervision.

148. Among other things, the Individual Defendants willfully or recklessly breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent

business judgment to protect and promote the Company's corporate interests.

149. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

150. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## **COUNT II**

***Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty***

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

154. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

**COUNT III**

***Against the Individual Defendants for Unjust Enrichment***

155. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGPI.

157. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MGPI that was tied to the performance or artificially inflated valuation of MGPI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

158. Moreover, as alleged herein, Individual Defendants Lux, Mingus, and Seaberg engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $14.2 million.

159. Plaintiff, as a shareholder and a representative of MGPI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

160. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

**COUNT IV**

***Against the Individual Defendants for Waste of Corporate Assets***

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period and resulted in continuous, connected, and ongoing harm to the Company.

163. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and colleting excessive compensation and bonuses; (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action; and (iii) losing financing from investors and business from future customers who no longer trust the Company.

164. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

165. Plaintiff, on behalf MGPI, has no adequate remedy at law.

**COUNT V**

***Against the Individual Defendants for Gross Mismanagement***

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. The Individual Defendants, either directly or through aiding and babetting, failed to uphold their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MGPI in a manner consistent with the operations of a publicly held corporation.

168. As a direct and proximate result of the Individual Defendants' gross mismanagement, MGPI has sustained and will continue to sustain significant damages.

169. As a result of the misconduct described herein, the Individual Defendants are liable to the Company.

170. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

## COUNT VI

***Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)***

171. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

173. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

174. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement, which was filed with the SEC.

175. As alleged above, the 2024 Proxy Statement was materially false and misleading because it omitted that: (i) the Individual Defendants did not fully grasp the decreasing demand in the alcohol industry; (ii) MGPI failed to adjust its production and inventory levels and,

therefore, the levels stayed significantly high despite the fact that demand decreased; (iii) by recommending that the Company's stockholders approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan, the Individual Defendants were wrongfully interested in increasing their compensation for the future; (iv) the Individual Defendants violated MGPI's Code of Conduct; and (v) the Individual Defendants failed to fulfill their risk oversight responsibilities.

176. The misrepresentations and omissions in the 2024 Proxy Statement were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of certain Individual Defendants and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan.

177. The Company was damaged because of Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

178. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

179. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

## COUNT VII

***Against the Individual Defendants***
***For Violations of Section 20(a) of the Exchange Act***

180. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase MGPI stock at prices artificially inflated by those materially false and misleading statements.

182. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

## COUNT VIII

***Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5***

183. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184. The Individual Defendants participated in a scheme with the purpose and effect of defrauding MGPI. Not only is MGPI now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon MGPI by the Individual Defendants.

185. During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $3.7 million to repurchase approximately 128,360 shares of MGPI common stock.

186. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

187. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGPI not misleading.

188. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and

authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by MGPI.

189. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

190. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend approximately $10 million in the repurchase of MGPI stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

191. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

192. Plaintiff, on behalf of MGPI, has no adequate remedy at law.

## COUNT XI

***Against Individual Defendants Bratcher, Colo, and Gall for Contribution Under Sections 10(b) and 21D of the Exchange Act***

193. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194. MGPI and Individual Defendants Bratcher, Colo, and Gall are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for

violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Bratcher's, Colo's, and Gall's willful and/or reckless violations of their obligations as officers and/or directors of MGPI.

195. Defendants Bratcher, Colo, and Gall, because of their positions of control and authority as officers and/or directors of MGPI, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of MGPI, including the wrongful acts complained of herein and in the Securities Class Action.

196. Defendants Bratcher, Colo, and Gall are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

197. As such, MGPI is entitled to receive all appropriate contribution or indemnification from Defendants Bratcher, Colo, and Gall.

198. Plaintiff, on behalf MGPI, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2025

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Brent LaPointe
Brent LaPointe, D. Kan. #78539
Phillip Kim (*pro hac vice forthcoming*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Facsimile: (212) 202-3827
Email: blapointe@rosenlegal.com
Email: philkim@rosenlegal.com

*Attorneys for Plaintiff Phillip Kruitwagen*

Docusign Envelope ID: 915B09A9-912F-4D6A-9B85-A045575BA9FF

# VERIFICATION

I, Phillip Kruitwagen am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 4/26/2025.

Signed by:

34CE84389FEA411...

Phillip Kruitwagen